UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MARY E. MORRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO.: 1:05-CV-255 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

**I. INTRODUCTION**

Plaintiff Mary Morris seeks judicial review[1] of the final decision of the Defendant Commissioner of Social Security, Jo Anne Barnhart, who found that Morris was not entitled to Disability Insurance Benefits ("DIB"). As the reader will soon learn, Morris's appeal is unsuccessful.

In short, the ALJ's determination to give the opinion of Morris's family doctor reduced weight, while affording the opinions of seven other treating and examining doctors significant weight, was supported by substantial evidence. The Commissioner's final decision, therefore, will be AFFIRMED.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

*A. Vocational Evidence*

At the time of her hearing on October 7, 2004, before the Administrative Law Judge ("ALJ"), Morris was forty-seven years old. (Tr. 518-19.) In 1980, she passed the General Educational Development (GED) test for high school equivalency. (Tr. 15.) She has worked for an extensive list of employers, many on a temporary basis, and her past work includes machine operator, hand packager, store laborer, and production assembler. (Tr. 67, 133.) Most recently, she worked as an office cleaner for a temporary service from August 8, 2002, until September 20, 2002. (Tr. 95.) Morris alleges she can no longer work due to plantar fasciitis and bursitis of her right foot, carpal tunnel syndrome, tenosynovitis of the wrists, degenerative arthritis in her knees and shoulders, rheumatism, obesity, and status post removal of her left kidney.

*B. Medical Evidence*

1. Doctor Jerry Mackel

On December 26, 2001, Morris had arthroscopic surgery on her right knee. (Tr. 215.) At a follow-up visit on January 7, 2002, Dr. Mackel, an orthopedic surgeon, noted that Morris was "doing well," and on January 28, he opined that she was "doing satisfactorily," as she had good range of motion in her knee. (Tr. 210, 215.) Although she complained on April 8 that she had some good and bad days and that she had some swelling, Dr. Mackel noted that she was "improving steadily" and recommended she increase her activity level. (Tr. 208-09.) On Morris's July 29 follow-up visit, Dr. Mackel found a full range of motion and no effusion in her

---

[2] The administrative record in this case is voluminous (556 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

right knee, noting significant improvement and only occasional symptoms. (Tr. 201.)

On October 21, Morris complained to Dr. Mackel of numbness, burning, and pain in both hands. (Tr. 199.) An examination revealed "some changes that appear almost reflex sympathetic dystrophy-like with hyperhidrosis and burning feeling in the fingers," and a Phalen's test, a test used to confirm diagnosis of carpal tunnel syndrome, yielded "questionable" results, but otherwise the exam was normal. (Tr. 199.) *See The Merck Manual of Diagnosis and Therapy* 491-92 (Mark H. Beers, M.D. & Robert Berkow, M.D., eds., 17th ed. 1999). Dr. Mackel opined that Morris "may have carpal tunnel with a lot of reflex pain." (Tr. 199.)

An EMG conducted on October 23 revealed "moderate to severe" carpal tunnel syndrome in Morris's left wrist and "mild" carpal tunnel syndrome in her right wrist. (Tr. 187, 193-195.) Dr. Mackel splinted both wrists and prescribed an anti-inflammatory drug; he also recommended carpal tunnel release surgery on Morris's left wrist, which she subsequently underwent on January 22, 2003. (Tr. 185-86, 190.)

On February 14, Morris saw Dr. Mackel after she slipped on some ice, falling on her outstretched left hand. (Tr. 178.) As an X-ray revealed only mild tenderness, Dr. Mackel concluded that Morris simply contused the area and had not sustained any significant or lasting damage or any disruption of the carpal tunnel release. (Tr. 178.) On March 3, Morris reported that she was "doing well" but that she was a little tender where she fell. (Tr. 176.) Noting her steady progress, Dr. Mackel released her to work. (Tr. 176.)

Morris returned to Dr. Mackel on March 31, ten days after she was in a car accident, complaining of soreness across the front of her shoulder and anterior knee. (Tr. 174.) X-rays

3

showed no acute fracture, and the exam was normal other than some tenderness. (Tr. 174.) Diagnosing Morris with a contusion of the knee, Dr. Mackel injected her knee, prescribed pain medication, and suggested some gentle pendulum exercises. (Tr. 174.) Furthermore, he opined that her prognosis "for return to baseline should be pretty good," informing her that after a dashboard contusion, the anterior knee often hurts for many months but that the pain will usually improve. (Tr. 174.)

Morris saw Dr. Mackel for a follow up on May 5. (Tr. 169.) An MRI revealed degenerative acromioclavicular joint changes and some low grade tendinopathy of the rotator cuff in her left shoulder and mild degenerative patellofemoral arthritis and medial compartment arthrosis with resolution of the intra-articular cyst of the meniscus in her right knee. (Tr. 169.) Dr. Mackel also noted that her physical exam remained "virtually identical to [the] exam in March." (Tr. 169.) Diagnosing her with an arthritic patellofemoral joint with aggravation from direct dashboard injury, slowly resolving, and tendinosis of the shoulder with impingement signs, he prescribed Medrol Dosepak and Naprosyn. (Tr. 169.)

On August 11, Morris complained of aching pains in her left wrist. (Tr. 428.) Noting that an EMG nerve conduction study completed after her carpal tunnel release showed significant improvement and that she had full range of motion, but that she had a moderately positive Finkelstein's test and a little puffiness in her wrist, Dr. Mackel opined that her symptoms were likely DeQuervain's tenosynovitis. (Tr. 428.) He injected the tendon sheath and placed her in a thumb Spica splint. (Tr. 428.)

A September 12 re-check of Morris's right knee revealed moderate to mild chondromalacia patella symptoms with catching but with no effusion, and an X-ray showed only

4

mild arthritic changes. (Tr. 426.) Dr. Mackel recommended that Morris start Glucosamine and that she perform quadriceps strengthening exercises. (Tr. 426.)

### 2. Doctor Chad Hemmer

The day after being involved in the car accident mentioned *supra*, Morris went to the emergency room complaining of right knee pain.[3] (Tr. 469.) Dr. Hemmer noted that Morris did not appear to be in any acute distress and that she had full range of motion in her right knee with no effusion, deformity, ecchymosis, or instability. (Tr. 469.) Furthermore, he found no significant findings upon examination, and X-rays revealed only some degenerative changes that were not the result of any accident or injury. (Tr. 469-70, 475.)

### 3. Doctor James Babcock

Morris's family physician, Dr. Aina, referred her to Dr. Babcock, an orthopedic surgeon, who evaluated her right knee pain on September 18, 2003. (Tr. 381-82.) On physical examination, he found normal alignment and full range of motion in her knee, with no swelling or effusion, and found only slight patellofemoral crepitation. (Tr. 381.) Examining an MRI taken earlier in the year, Dr. Babcock noted some medial joint degenerative changes and some degenerative changes in the postural horn of the medial meniscus without tear. (Tr. 382.) He was unable to make a specific diagnosis but opined the primary problem appeared to be patella-femoral stress. (Tr. 382.) Recommending physical therapy, he advised against any further surgical intervention. (Tr. 382.)

### 4. Doctor Charles Sanders

---

[3] Morris also complained of pain in her lower right ribs, but as these symptoms do not pertain to her disability claim, any related tests and treatment are not discussed here.

Morris's family physician, Dr. Aina, referred her to Dr. Sanders, a rheumatologist, who evaluated her for rheumatoid arthritis on December 3, 2002. (Tr. 255.) Reporting that her problems began about seven years ago, Morris related that her current problems involve swelling and discomfort in her hands, forearms, shoulders, and the musculature of the neck, stating at times she "hurts everywhere." (Tr. 255.) She further reported that most of her symptoms appear to be related to carpal tunnel syndrome and that she was planning on having surgery. (Tr. 255.)

On physical exam, Dr. Sanders found that Morris had normal strength and reflexes. (Tr. 257.) She had some tender points in her elbows, in her cervical spine, and in both legs below her knees; and she had crepitance in both knees. (Tr. 257.) The remainder of her musculoskeletal exam, however, was unremarkable. (Tr. 257.) Dr. Sanders concluded that Morris had myalgia in her shoulder regions resulting from a combination of soft tissue rheumatism and carpal tunnel syndrome, but that there was no evidence of rheumatoid arthritis or any other inflammatory arthropathies. (Tr. 257.) He also found that she did not have enough tender points to constitute "true" fibromyalgia. (Tr. 257.) His diagnoses were obesity and bilateral patellofemoral arthritis of the knees. (Tr. 257.)

Dr. Sanders saw Morris again on December 26. (Tr. 250-251.) Dr. Sanders did not change his previous diagnoses, noting that rheumatoid factor tests were all negative, that X-rays of both hands revealed only some mild degenerative change in her first metacarpal joints, and that X-rays of her right shoulder were normal. (Tr. 250-51.) He also opined that "a lot" of her symptoms were secondary to her carpal tunnel syndrome, that she had improved overall, and that her current medication regime was beneficial. (Tr. 250-51.)

Over one-year later, on January 12, 2004, Morris had a follow-up visit with Dr. Sanders,

6

who noted that despite numerous medications and multiple therapies, including physical therapy, Morris continued to have pain in her wrists, small joints of her hands, and knees. (Tr. 242-43.) After examination, his impressions remained the same, and he changed her medication regime. (Tr. 243.)

Morris reported to Dr. Sanders on February 10 that her new medications were "somewhat" beneficial, and she rated her pain as five out of ten, whereas she previously rated it seven out of ten. (Tr. 236.) He noted that all of his recent studies, including a recent rheumatoid factor study, were negative and that recent X-rays of Morris's knee revealed only minimal degenerative changes in the medial compartments. (Tr. 236.) Although he initially thought she had soft tissue rheumatism, he suspected that what she really has is atypical fibromyalgia syndrome. (Tr. 236-37.) Reiterating that he could not detect any evidence of underlying inflammatory connective tissue disease, he returned her to the care of her family doctor. (Tr. 237.)

### 5. Doctor Mark Zolman

On June 20, 2003, Morris saw Dr. Zolman, a physiatrist, who recommended she wear splints at night and also proposed a physical therapy regime for her carpal tunnel syndrome. (Tr. 166.) During physical therapy, she was instructed on home exercises and on soaking her hands and wrists to relieve her symptoms. (Tr. 439-47.)

Morris saw Dr. Zolman for a follow-up on August 1, reporting that her symptoms overall were about the same but at times they were worse, particularly with increased activities. (Tr. 434.) Furthermore, she complained that physical therapy exacerbated her pain. (Tr. 434.) On examination, Dr. Zolman noted that Morris was in no apparent distress; that her Tinel's and

carpal compression were negative; that there was no thenar atrophy, no synovitis, and no swelling; and that her strength was 4/5 in the left wrist and normal in the right wrist. (Tr. 434.) He recommended wrist splints and home exercise and prescribed Neurontin. (Tr. 435.)

### 6. Doctor Anil Rao

At the request of Dr. Aina, Morris saw Dr. Rao, a rheumatologist, on April 14, 2004, regarding her complaints of multiple joint pain. (Tr. 355.) Dr. Rao found Morris's general physical examination to be unremarkable, and her joint examination revealed a full range of motion in her hands, wrists, elbows, shoulders, ankles, knees, and hips. (Tr. 356.) X-rays of her right shoulder were normal, her right knee showed a mild degree of medial joint narrowing, and her left knee showed mild degenerative spurring. (Tr. 355.) He detected no evidence of rheumatoid arthritis but opined she had very early signs of osteoarthritis of the knees. (Tr. 356.) Observing some tenderness in both her knees, Dr. Rao's impression was diffuse joint and muscle aches related to a predominantly fibromyalgia-like syndrome. (Tr. 356.) He recommended that she join a regular water aerobic exercise program. (Tr. 356.)

### 7. Doctor Nancy Hockley

On June 4, 2003, Morris saw Dr. Hockley, a urologist, complaining of numerous kidney infections that occurred "on and off" for the last thirty years and reporting that her most recent symptoms began on March 21 when she went to the emergency room, where was told she had a urinary tract infection and was prescribed an antibiotic. (Tr. 333, 337.) Furthermore, she reported that a week later, she had a yearly gynecology exam, where she was told her urine was still infected and was prescribed Cipro. (Tr. 337.) Dr. Hockley found her urine infected, and after reviewing a CT scan of Morris's left kidney, Dr. Hockley's impressions included bilateral

duplication, atrophic left lower pole of the kidney, hydronephrosis of the upper pole, and a large, obstructing upper pole ureterocele. (Tr. 333, 335.) After this visit, Dr. Hockley ordered more tests (Tr. 313-34), and on August 27, 2003, the ureterocele was surgically removed to clear up the urinary tract infection. (Tr. 310.) Eventually, Morris's left kidney was removed on February 23, 2004. (Tr. 278-79.)

On June 2, Morris saw Dr. Hockley, complaining that her abdomen was painful, particularly with motion, and claiming that she was "working on this pain" with Dr. Aina. (Tr. 405.) Dr. Hockley noted that Morris reported the same type of discomfort during her last visit and that Morris did not call her, as Dr. Hockley suggested, if she continued to have pain. (Tr. 405.) Furthermore, Dr. Aina referred Morris to a pain management specialist, but she did not keep the appointment, and a CT scan ordered by Dr. Aina revealed no abnormalities. (Tr. 405.)

Upon physical examination, Dr. Hockley noted that Morris was very slow to get out of her chair but that she got on the table without too much trouble. (Tr. 405.) In addition, Dr. Hockley found that her abdomen was benign other than some left lower quadrant discomfort to palpitation, that her wound was "fine," and that Morris was not tender over the wound. (Tr. 405.) She also noted that Morris's abdomen was obese. (Tr. 405.) Concluding that Morris was "doing well" post surgery, Dr. Hockley offered to refer Morris to different pain management specialists. (Tr. 405.)

### 8. Doctor Richard Jackson

On January 21, 2002, Morris saw Dr. Jackson, a podiatrist, complaining of pain in her left heel. (Tr. 212.) An X-ray revealed some mild degenerative changes along the tarsometatarsal joints and the calcaneocuboid joint and a moderate plantar heel spur. (Tr. 212.) Noting

9

tenderness to palpitation, Dr. Jackson diagnosed plantar fasciitis and a heel spur and injected her heel with a combination of Depo-Medrol and Marcaine. (Tr. 212-14.) He recommended she take ibuprofen, use ice and heat, and do stretching exercise. (Tr. 213.)

She saw Dr. Jackson again on April 12, complaining of pain in her right heel, but also reporting that her left heel was "okay" as she experienced only occasional pain. (Tr. 205.) On physical exam, Morris had some tenderness to palpitation along the mid plantar aspect of her right heel and along the medial plantar aspect of the plantar fascial insertion, but otherwise the exam was normal. (Tr. 205.) Dr. Jackson diagnosed plantar fasciitis and bursitis of the right foot and injected her right heel with Depo-Medrol and Marcaine. (Tr. 205.) He recommended that she take Celebrex and do stretching exercises. (Tr. 205.)

### 9. Doctor Richard Aina

Treatment notes from Dr. Aina, Morris's family physician, date from February 2003 to May 2004. (Tr. 345-402.) These records show Dr. Aina prescribing pain and antidepressant medications and referring Morris for consultations with various specialists for her complaints of kidney problems and pain, particularly the pain resulting from her car accident. (Tr. 345-402.)

At the request of Morris's attorney, Dr. Aina completed a "Medical Source Statement" on October 20, 2004, approximately two weeks after Morris's hearing with the ALJ. (Tr. 510.) Dr. Aina's diagnoses included rheumatoid arthritis/soft tissue rheumatism, generalized anxiety disorder/depression, hemorrhoids, history of colonic polyp, carpal tunnel syndrome, high cholesterol, and obstructing upper pole left kidney. (Tr. 511.) When asked to identify clinical signs and objective findings, Dr. Aina answered that Morris was seen by two rheumatologists for fibromyalgia and for multiple joint and muscle aches and that she was seen by orthopedic

doctors for degenerative joint disease. (Tr. 512.) Furthermore, Dr. Aina wrote that he was unsure of Morris's prognosis, as she was attempting to find answers to all her medical problems. (Tr. 511.)

Opining that Morris could not work full time due to the "unpredictability of pain onset and [its] duration or frequency," Dr. Aina estimated that if working full time, she would miss more than three days of work per month. (Tr. 513-14.) He also believed that obesity contributed to the severity of Morris's symptoms and functional limitations. (Tr. 513.)

*C. Procedural History*

Morris originally filed a claim for DIB on December 31, 2002, alleging a disability onset date of September 20, 2002. (Tr. 58.) After she was denied initially and on reconsideration, ALJ Frederick McGrath conducted a hearing on October 7, 2004, and rendered an unfavorable opinion on March 4, 2005. (Tr. 14-25, 26-27, 516.) The Appeals Council denied Morris's request for review. (Tr. 4-10.) Morris filed here on July 27, 2005, seeking review of the Commissioner's decision, and the matter is now fully briefed.

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th

Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. DISCUSSION

### *A. Legal Framework*

Under the Act, a plaintiff is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether Morris is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following issues in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the

claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### B. The ALJ's Decision

In a written decision issued on March 4, 2005, the ALJ determined that Morris was not disabled. (Tr. 14-25.) The ALJ decided in Morris's favor on steps one and two, finding that Morris's degenerative joint disease of her knees; chronic bilateral knee pain, status-post right knee arthroscopy; bilateral plantar fasciitis and bursitis; rheumatism; bilateral carpal tunnel syndrome, status-post left carpal tunnel release surgery; and status-post removal of her left kidney were severe, but also finding that she did not meet a listing at step three. (Tr. 23.) He then ascertained that Morris had an RFC to perform light, unskilled work "that involves only simple, routine, repetitive job tasks, no production rate pace work, but rather goal oriented work and occasional personal interaction with co-workers." (Tr. 24.) Based on this RFC, the ALJ found at step four that Morris could perform her past relevant work as a production assembler. (Tr. 24.) Relying on the testimony of a vocational expert, the ALJ alternatively found at step five that

---

[4] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

Morris was capable of performing work in the national economy. (Tr. 24.) Therefore, Gibson was not entitled to DIB. (Tr. 25.)

In reaching this decision, the ALJ determined that Morris's allegations about her limitations were not credible because they were inconsistent with objective medical evidence and her treatment history. (Tr. 20, 23.) Furthermore, he found the opinions of Dr. Jackson, Dr. Mackel, Dr. Sanders, Dr. Hemmer, Dr. Babcock, Dr. Hockley, and Dr. Rao to be generally consistent, well-supported by the objective testing evidence of record, and accompanied by a clear medical rationale; therefore, he gave these opinions "significant weight." (Tr. 21.) The ALJ, however, gave "reduced weight" to the opinion of Dr. Aina, finding that his opinions were not well-supported by Morris's "longitudinal record;" more specifically, the ALJ determined that Dr. Aina's conclusion that Morris could not work full time lacked any explanation and was not supported by the other doctors' objective findings or by the objective test results. (Tr. 21.)

Morris's sole argument on appeal is that the ALJ improperly evaluated the opinion of Dr. Aina, claiming that Dr. Aina's opinion is entitled to greater weight because he was the only doctor who based his opinion on all of her medical conditions. Furthermore, Morris argues that the ALJ's reasoning was incorrect because Dr. Aina did, in fact, offer an explanation regarding her inability to work full-time. Finally, she claims that if the ALJ believed that Dr. Aina's opinion lacked explanation, he had a legal duty to re-contact the doctor. These arguments will be discussed in turn.

*C. The ALJ's decision to give Dr. Aina's opinion reduced weight is supported by substantial evidence*

The opinion of a treating physician should be given great weight in disability

determinations because of his or her greater familiarity with the claimant's conditions and circumstances. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). More specifically, if the ALJ finds that the treating physician's opinion is "well supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record," the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

In the event the treating physician's opinion is not given controlling weight, the Commissioner applies the following factors to determine the weight given to the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled," because "a treating physician may bring biases to an assessment." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. *Id.*; 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ gave "reduced weight" to the opinion of Morris's family physician, Dr. Aina, finding that his opinion was not well supported by the "longitudinal record." (Tr. 21.)

Morris counters that Dr. Aina was the only doctor who considered all of her medical conditions, specifically her obesity, arguing that because his opinion is "based on a wider set of facts," it is not necessarily inconsistent with the other doctors' opinions. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 19.)

As a threshold matter, the Commissioner responds that Dr. Aina was not the *only* doctor to consider Morris's obesity, as Dr. Sanders also reached this diagnosis.[5] In reply, Morris hedges her argument, claiming that the opinions of Dr. Aina and Dr. Sanders are not inconsistent as Dr. Sanders rendered no opinion regarding the effects Morris's obesity had on her rheumatism and her ability to function. She further argues that because Dr. Sanders rendered no such opinion, any conclusion the ALJ drew from Dr. Sanders's diagnoses was impermissible inference.

Seemingly, Morris is claiming that because Dr. Aina is the only doctor of record who rendered an opinion regarding her functional limitations, his opinion that she cannot work full time is determinative. However, the Commissioner, not Dr. Aina, decides whether Morris is disabled. 20 C.F.R. § 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.") When the ALJ made his decision, he compared Dr. Aina's subjective opinion that Morris could not work to the other medical evidence in the record, including Dr. Sanders's diagnoses, which is *exactly* what the ALJ is supposed to do. 20 C.F.R. § 404.1527(d)(2) (If a treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the ALJ] will give it controlling weight."). Thus, the ALJ did not engage in improper inference.

---

[5] In fact, Dr. Hockley also noted that Morris's obesity might be a contributing factor to her abdominal problems. (Tr. 405.)

16

Furthermore, the ALJ is required to weigh conflicting medical evidence, ultimately deciding which evidence to believe, and this Court does not resolve evidentiary conflicts. *Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (finding that when an examining physician's opinion was contradicted by several other examining and non-examining physicians' opinions, the ALJ's decision to believe the latter group was supported by substantial evidence). Here, Morris argues that Dr. Aina's opinion cannot conflict with those of the other doctors because his opinion is essentially the sum of all the other opinions' parts, citing *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir. 1985), as the only support for her argument.

In *Beecher*, the discredited doctor took into account both the claimant's physical and psychological impairments, whereas the other doctors considered only the claimant's physical impairments when rendering their opinions. *Id.* Finding that the discredited doctor's opinion was uncontradicted by the record, the Court opined that "[t]his is not a case where there are conflicting medical viewpoints and the ALJ simply chose one view over the other. . . . [W]e cannot conclude that the opinions conflict, but only that they are not drawn from the same facts." *Id.* (quoting *Dressel v. Califano*, 558 F.2d 504, 508 n.6 (8th Cir.1977)) (internal quotations marks omitted).

Contrary to Morris's assertions, Dr. Aina's "Medical Source Statement" conflicts with at least two doctors' opinions. Dr. Aina bases his belief that Morris cannot work on a diagnosis of rheumatoid arthritis, a diagnosis explicitly rejected by both rheumatologists of record, Dr. Sanders and Dr. Rao, as their objective tests results were negative for this condition. The ALJ also rejects this diagnosis, reasoning that "extensive testing has shown conclusively that she does not have this condition." (Tr. 20.)

Even if Dr. Aina did not give this conflicting diagnosis, the ALJ's decision to give his opinion reduced weight would still be supported by substantial evidence. In *Stephens v. Heckler*, 766 F.2d 284, 288-89 (7th Cir. 1985), the Seventh Circuit rejected the argument that an ALJ is required to give greater weight to the opinion of a general practitioner over the opinions of specialists due to the general practitioner's greater familiarity with a claimant's overall physical condition. *Id.* ("[T]he regular physician . . . may lack an appreciation of how one case compares with other related cases. . . . [A] specialist can tell how a patient fits in a spectrum of similar ailments . . . ."). Here, the ALJ chose to discount the opinion of a family physician in favor of six specialists, finding their opinions to be "generally consistent, well-supported by the objective testing evidence of record, and accompanied by a clear medical rationale," and the Court will not re-weigh this medical evidence. *Id.* at 289 (finding that the ALJ was "entitled" to favor specialists' reports over those of claimant's general physician, as the specialists examined the claimant and rendered "complete reports" that were "factual, not speculative"); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Morris also argues that the ALJ's assessment that Dr. Aina "did not put forth any explanation for [his] opinion" that Morris could not work was incorrect because Dr. Aina opined that Morris could only work part time due to the "unpredictability of pain onset and duration or frequency." (Tr. 513.) While technically Morris's claim is accurate, any "error" that the ALJ made by this statement is clearly harmless. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003)) (applying harmless error review to ALJ's determination). Here, the ALJ did not rest his rejection of Dr. Aina's opinion merely on any perceived lack of explanation, as he also notes that Dr. Aina's opinion "is not

supported by the objective findings of the claimant's other treating doctors or by the objective test results of record." (Tr. 21.) Because these reasons alone would entitle the ALJ to discount Dr. Aina's opinion, "any remand for explicit consideration" of Dr. Aina's explanation of his opinion "would not affect the outcome of this case." *Skarbek*, 390 F.3d at 540.[6]

Finally, Morris claims that the ALJ failed to meet his legal duty under 20 C.F.R. § 404.1512(e) to re-contact Dr. Aina if he thought the doctor's explanation was lacking. The Commissioner responds that 20 C.F.R. § 404.1512(e) requires the ALJ to re-contact a treating physician only "[w]hen the evidence [the ALJ] receive[s] from [the claimant's] treating physician . . . is inadequate for [the ALJ] to determine whether [the claimant is] disabled," 20 C.F.R. § 404.1512(e), arguing that the evidence in the record, when taken as a whole, was more than adequate for the ALJ to find Morris not disabled. Replying that the Commissioner misconstrued the regulation, Morris argues that "whether the evidence is 'inadequate' under the regulation goes to the opinion of the treating physician and not the evidence as a whole," but offers no law in support of this proposition.

Seventh Circuit case law appears to support the Commissioner's interpretation, as the Court has held that "[a]n ALJ need re-contact medical sources only when the evidence received

---

[6] Morris argues that the ALJ's "bald statement" that Dr. Aina's opinion was not supported by the objective findings of the other doctors or by objective test results was not a "giving of good reason" because the ALJ did not explain how these objective records undercut Dr. Aina's opinion. (Reply Br. 4-5.) The ALJ has a duty to "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as the ALJ's opinion "is important not in its own right but because it tells us whether the ALJ has considered all the evidence as the statute requires him to do." *Stephens*, 766 F.2d at 287 ("[T]he court review[s] judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills.")

Here, the ALJ met his burden of minimal articulation, as it is apparent from his summary of each doctor's medical findings that he considered all of the medical evidence before him. Furthermore, he cited to these findings when determining the weight given to each doctor's opinion. *See Skarbek*, 390 F.3d at 503 ("Here, the ALJ provided an adequate explanation for giving more weight to [two doctors'] opinions: [the third doctor's] opinion was not well-supported by medical evidence.").

19

is inadequate to determine whether the claimant is disabled. . . . Here, the evidence was adequate for the ALJ to find [claimaint] not disabled . . . ." *Skarbek*, 390 F.3d at 500 (citing 20 C.F.R. § 404.1512(e)). Given all of the evidence listed in Part II *supra*, the ALJ had an adequate record with which to make his disability determination.[7]

## V. CONCLUSION

In sum, the ALJ's determination that Dr. Aina's opinion was only entitled to reduced weight is supported by substantial evidence. For this reason, the Commissioner's final decision is hereby AFFIRMED. The clerk is directed to enter a judgment in favor of the Commissioner and against Morris. SO ORDERED.

Enter for February _2, 2006.

                                          S/ Roger B. Cosbey
                                          Roger B. Cosbey
                                          United States Magistrate Judge

---

[7] Morris also quotes from 20 C.F.R. § 404.1512(e)(1) for the proposition that an ALJ is to re-contact a doctor when the doctor's report "does not contain all the necessary information." It is difficult, however, to see how this language is helpful to Morris, as any further explanation from Dr. Aina is not "necessary," given the ALJ's other reasons for rejecting his opinion discussed *supra*.